2024 IL App (2d) 220158
No. 2-22-0158
Opinion filed March 27, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-CF-2152 |
| | ) | |
| KEVIN COOPER, | ) | Honorable |
| | ) | Donald Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justice Hutchinson concurred in the judgment and opinion.
Justice Kennedy dissented, with opinion.

**OPINION**

¶ 1   Following a jury trial, defendant, Kevin Cooper, was convicted of two counts of aggravated battery for causing bodily harm to a victim aged 60 or older and (making) physical contact of an insulting or provoking nature with a victim aged 60 or older.[1] 720 ILCS 5/12-3.05(d)(1) (West

_____

[1]These counts were later merged together due to the one-act, one-crime rule because they were based upon a single physical act. See *People v. Artis*, 232 Ill. 2d 156, 161 (2009) (the one-act, one-crime rule applies " 'where more than one offense is carved from the same physical act' " and the lesser offense is a lesser included offense of the greater offense (quoting *People v. King*,

2020). He was found not guilty of aggravated robbery of a victim aged 60 or older. *Id.* § 18-1(a), (c). The circuit court sentenced defendant to 10 years' imprisonment. He appeals his conviction, arguing (1) the State failed to prove the aggravating element that defendant knew the victim was aged 60 or older; (2) the court violated his due process right to a fair trial or, alternatively, he received ineffective assistance of counsel when the court refused to allow him to lower his mandated protective mask during closing argument; and (3) portions of the photograph array lineup procedure were suggestive and unreliable, entitling defendant to a new trial. We affirm.

¶ 2                              I. BACKGROUND

¶ 3     Defendant was indicted with one count of aggravated robbery (*id.*), two counts of aggravated battery (*id.* §§ 12-3, 12-3.05(d)(1)), one count of unlawful possession of another's credit or debit card (*id.* § 17-32(b)), and one count of unlawful use of a credit or debit card without the cardholder's consent (*id.* § 17-36). The charges stemmed from an October 6, 2020, encounter involving defendant and the victim, Robert Manella, outside of Manella's place of residence, the Jennings Terrace Assisted Living Facility (Jennings Terrace). Pertinent to this appeal, count II of the indictment alleged that defendant violated section 12-3.05(d)(1) of the Criminal Code of 2012 (Code) (*id.* § 12-3.05(d)(1)) in that, while "committing a battery" under section 12-3 (*id.* § 12-3), he "knowingly or intentionally caused bodily harm to Robert Manella, a person 60 years of age or older, in that he struck [Manella] in the face." Further, count III alleged that defendant violated section 12-3.05(d)(1) in that, while "committing a battery" under section 12-3, he "knowingly or intentionally made contact of an insulting or provoking nature with Robert Manella, a person 60 years of age or older, in that he struck [Manella] in the face." In short, counts II and III of the

66 Ill. 2d 551, 566 (1977))).

indictment each charged defendant with misdemeanor battery against Manella (*id.* § 12-3) as elevated to the Class 3 felony offense of aggravated battery for knowingly and intentionally causing bodily harm or making contact of an insulting or provoking nature with a person 60 years of age or older (*id.* § 12-3.05(d)(1)).

¶ 4 When the case proceeded to a jury trial on December 13, 2021, the circuit court stated to prospective jurors the following during *voir dire*:

"I do require that the jurors wear masks. I require that the attorneys wear masks unless they are addressing a witness. They can obviously remove their mask so you can hear them better. The witnesses will not have a mask on, and that is so you can see their face, judge their credibility as you wish, and you can understand them. I have a mask here on the bench.

\*\*\*

[W]hat I would ask that you guys do is when you look at what we've done to try to make everybody safe, we are more than happy to accept recommendations on what we can do differently in the future in this respect."

¶ 5 During defendant's opening statement, counsel told the jury that "there were two separate and distinct crimes." She stated:

"There was a robbery of Robert Manella and an aggravated battery, and then later there's a different crime of unlawful use of a debit or credit card. [Defendant] had nothing to do with the robbery and battery. He admits he used a credit card that didn't belong to him, and he's going to ask that you find him guilty of what he's responsible for; but that night, the robber gave [defendant] a debit card and [defendant] went and spent six dollars at the gas station."

¶ 6 On direct examination, Aurora police officer Nicole Holland testified that she responded to a call from Jennings Terrace on October 6, 2020, at approximately 10:44 p.m. She received a dispatch that a robbery had occurred at Jennings Terrace and that the suspect was described as "a male black, about six-foot, wearing a black hat, black shirt; unknown direction of travel." Officer Holland arrived at Jennings Terrace and spoke to the staff, who directed her to the nursing station where Manella was receiving treatment. She described Manella as relatively calm and "in good condition, other than some blood up by his eyes and his nose and mouth." Manella described the perpetrator as "a male black, about six-foot, wearing a black hat, heavier set," and wearing a black shirt with a light-colored hooded sweatshirt. Manella did not request an ambulance for treatment and instead received treatment from the Jennings Terrace nursing staff.

¶ 7 While Officer Holland investigated the scene of the incident, she took photographs, which were admitted into evidence without objection, and testified that they fairly and accurately depicted how Manella appeared when she spoke to him that night. The photographs of the facial injuries that Manella sustained during the attack also showed that he had gray hair and a receding hairline, graying eyebrows, white whiskers, bags under his eyes, and apparent age spots on his forehead. Officer Holland stated that Jennings Terrace did not have surveillance cameras. She described where Jennings Terrace was located and said that the incident had occurred on the east side of the building. She canvassed the neighborhood to find surveillance cameras, but she was unable to locate any surveillance video. Officer Holland questioned additional staff members from Jennings Terrace, but she was unable to find any other witnesses.

¶ 8 On cross-examination, Officer Holland testified that Manella did not know who the perpetrator was. Manella told Officer Holland that the attack had occurred inside the entryway vestibule of Jennings Terrace. Officer Holland did not attempt to collect DNA evidence or

fingerprints inside the vestibule "because it's a highly-trafficked area." When Manella provided the description of the offender to Officer Holland, he told her that he believed he could identify the perpetrator if he saw him.

¶ 9 Manella testified on direct examination that he was 68 years old. He has resided at Jennings Terrace for about 10 years, including on October 6, 2020, the date of the incident. Jennings Terrace is divided into two sections—one side of the building is a nursing home and the other side is "assisted living" or "sheltered care." Manella stated that he resides in the sheltered-care side of the building.

¶ 10 At approximately 10:30 p.m. on October 6, 2020, Manella stood outside of Jennings Terrace smoking a cigarette by himself. The State presented a number of photographs to Manella depicting the area that night. Manella stated that the photographs accurately showed the outside of the sheltered-care main entrance to Jennings Terrace as it appeared on the date of the incident. The photographs were admitted without objection and published to the jury.

¶ 11 Manella stood approximately 15 feet from the door while he smoked a cigarette, in accordance with the law prohibiting smoking within 15 feet of a nursing home. He pointed to the location where he was standing in one of the photographs. State's exhibits 9 and 10, which were published to the jury, were photographs of the circular driveway and parking lot leading to the entrance of the Jennings Terrace sheltered-care main entrance. The photographs depicted a sign that states, "Jennings Terrace South Entrance" and "Assisted Lifestyle." Manella testified that this sign is located just inside the property and was also present on the date of the incident. State's exhibit 7 depicted another photograph of a Jennings Terrace sign labelled, "Assisted Lifestyle • Nursing Care," although Manella did not testify regarding that sign's location on the property relative to where he was standing that night.

¶ 12 The photographs of the entrance to Jennings Terrace displayed a few warning signs taped to the doors, including one that stated, "All staff and visitors must report directly to Nurse's Station for temporary screening." Another sign taped to the entrance doors stated, "Sorry, because of the risk of COVID to our residents and staff, there is no public bathroom available." In addition, a sign taped to the doors listed visitation information. The State did not ask Manella questions regarding these signs; however, the jury viewed the photographs as part of the evidence.

¶ 13 As Manella stood outside smoking a cigarette in the dark, he observed a man "pounding on the front doors of Jennings Terrace," at the main entrance to the sheltered-care portion of the facility. Manella stated that the man was black and between 5 feet, 6 inches, and 5 feet, 10 inches, tall. Manella described the man as "very slender" with a compact build, similar to "a running back in football, and he was very lean and well proportioned, muscular-wise." Manella stated that it was difficult to discern the age of the person but believed he was "probably somewhere between 22 and 34 *** because of the lighting." He denied that he had told Officer Holland that the man he observed was "heavier-set."

¶ 14 Manella did not recognize the man as someone who either resided or worked at Jennings Terrace. He believed the man possibly "could have been a new hire." Manella described the lighting as "not the greatest," stating that there was "a bullet light where those signs are on the building," located "on the ground at the corner and they shine up at the Jennings Terrace." He also described a square light above the front entrance to the building with a 60- to 100-watt light bulb.

¶ 15 According to Manella, the man pounding on the front entrance door did not say anything. Manella approached him and asked if he was an employee. The man responded by asking "if there was anybody inside." Manella again asked him if he was an employee. The man repeated the same question to Manella. At that point, both Manella and the man were standing under the front

entrance light, and Manella stated that they stood "equi-distance" [*sic*], approximately two to three feet from one another. Manella once more asked the man if he was an employee and the man "started asking me if I was a resident." Manella repeated his question, asking whether the man was an employee. The man again asked Manella, "[a]re you a resident?" Manella then responded, "this is an old-folks home and there are nurses and CNAs in there, and if I go inside and tell them that you're out here and they call the police and the police catch you out here, you could be arrested for trespassing."

¶ 16     Once again, the man asked Manella if he was a resident, and Manella repeated the same answer. At that point, Manella told the man, "if you're not going to leave, I'm going in," and he pulled the front door open. Manella explained that "right at the shift change [for Jennings Terrace employees] the doors are not locked. That's why I take my final cigarette at that particular time of night."

¶ 17     Manella next testified regarding photographs depicting the front entryway vestibule of Jennings Terrace, which the State presented as exhibits 16 through 19. These exhibits were admitted without objection and published to the jury. Manella described the two sets of doors leading from the front entrance into the vestibule, along with a second set of doors leading into the building. After confronting the man outside the building, Manella opened the doors just wide enough to pass through into the vestibule and stated that "it takes me a while [*sic*] to get turned around because of my disability." Manella was unable to close the front entrance doors. He did not invite the man into the building because "he wasn't allowed." Manella testified that he "didn't know who [the man] was, visiting hours were over at 8, and he wouldn't tell me if he was an employee, so I wasn't going to let him in." Manella stated that he told the man three separate times that Jennings Terrace was "an old-folks home" and that he could be arrested for trespassing.

¶ 18    Manella described what the man did as Manella attempted to close the doors: "He stuck his foot in between the doors and he hit me right here in between the eyes; and then because of my imbalance, I started to go down. He hit me again in the face, more on the left-hand side." Manella stated he did not know that the man was going to punch him. The man did not have an accomplice with him—he was by himself. When Manella fell to the ground and rolled onto his stomach, the man continued to hit him "[a]ll about the head, and then he started hitting on [his] kidneys." While Manella was lying on the ground, he was unable to view the man's face. Manella stated that the man took his wallet from his right rear pocket. Asked to describe how the man took his wallet, Manella testified, "Uh, after he quit punching me, he immediately lifted me *** up by my left pocket and felt in my left pocket, left rear pocket; and then he lifted me up a little bit by holding my right pocket and lifting me up, and he pulled my wallet out."

¶ 19    After the man took Manella's wallet, Manella started screaming for help. He saw the man "heading for the inner set of security doors to get inside of the facility." Manella kicked his legs out to trip the man, and he stumbled. Manella stated that he could hear the man stumbling inside the vestibule and "finally he left." Manella managed to rise and lurch through the entrance and found the nurses' station. He told the nurses to call the police.

¶ 20    Manella next described the photographs depicting the injuries he sustained to his head from the attack. He was bleeding from an area between his eyes, from his nose where his glasses had broken, and at the right corner of his mouth. When the assistant state's attorney asked Manella if he "look[ed] like that before [the attack]," Manella responded, "I looked worse."

¶ 21    Manella testified that he had five counterfeit $100 bills in his wallet. He stated that the money in his wallet "look[s] identical to genuine $100 bills, except they didn't have the color

change *** ink [or] the Franklin watermark." Manella had two debit cards in his wallet, including one from Old Second National Bank, with his name embossed on the card.

¶ 22    A few weeks after the incident, the police returned to interview Manella. Officers asked him to view a lineup of photographs of potential suspects. When Manella viewed the photo lineup, he wore "[a] very old pair of readers that [he] could not hardly see very well with," because the offender had broken his prescription bifocal glasses during the incident. Manella described the difference in viewing capability between the two pairs of glasses as "tremendous."

¶ 23    As Manella viewed the photo lineup of potential suspects, he could not pick out the offender with 100% certainty because "the pictures only came to the person's collar bone, and it did not show [him] the body language or *** any of the other distinguishing features, like how he stood, or whatever." Manella stated that he also was unable to distinguish the weight of the potential offenders.

¶ 24    Next, Manella testified regarding State's exhibit 24, which was a video recording of the photo lineup that he viewed with a detective. Manella stated that the recording was an accurate depiction of what had occurred, and the exhibit was admitted without objection and published to the jury.

¶ 25    Detective Koenings, an independent administrator, presented the photo lineup to Manella on October 19, 2020. At the beginning of the recording, Manella can be seen putting on a pair of glasses. Detective Koenings provided a series of acknowledgements to Manella before having him view the photographs, including that the offender "may or may not" be included in the lineup and that it is equally important to exclude innocent persons as it is to identify potential suspects. Manella signed a document affirming that that he understood the acknowledgments. Manella also stated that he understood that the police investigation would continue regardless of whether he

made an identification from the lineup. He emphasized to Detective Koenings that he wanted to be absolutely sure he identified the right person. He also told Detective Koenings that the glasses he was wearing were not his regular prescription glasses. When Manella viewed the photograph of defendant, which was photograph 5, he shook his head and stated, "I don't believe so, he looks too old." He viewed the photograph of defendant again and stated, "[t]oo heavy, too old." Manella stated that a photograph of a different potential suspect, which was photograph 2, was more likely the man who attacked him, but he did not make a positive identification of the offender during the photo lineup. He told Detective Koenings that he was 60% to 75% sure that the man depicted in photograph 2 was the offender. He then stated that, among the pictures he viewed, he was 85% to 95% certain that the offender was depicted in photograph 2 and that if he saw that person randomly in public, he would be 65% to 75% certain that person was the offender.

¶ 26    After the jury viewed the recording, Manella testified that he occasionally placed his hand on some of the photographs as he attempted to identify the offender. He explained, "the individual that assaulted me, that night that he assaulted me he had on a very distinctive baseball cap that had *** their name across the whole top of the cap," with "silver garland through it, something I had never seen before." Manella continued that he did not see the hair of the man who assaulted him and that he tried to "make sure that [he] was just looking at the features that [he] actually saw that night," referring to the offender's eyes, nose, and mouth. He did not want to simply guess because he did not want to pick the wrong person. He wanted to be 100% sure the person he identified was the offender.

¶ 27    On cross-examination, Manella testified that he was wearing his prescription glasses immediately before he was assaulted. He stated that he was able to see the offender's entire face, excluding the hair, which was covered by a blue hat. The offender wore a black T-shirt and "some

kind of a jacket," which he called "a hoodie." Manella stated that the man "was built like a football running back." He clarified that "[a] running back is muscular, but they are lean. It's more like a person who is in, like, karate. Very good shape, but very lean, but muscular." Manella also stated that it was difficult to discern the offender's age because he was "young and fit." He guessed the offender was aged between 22 and 34 years old.

¶ 28     Elton Govada testified that he was working as a cashier at a gas station in Aurora on the night of October 6, 2020. Govada identified a photograph of the gas station where he worked, which was admitted without objection. He stated that the photograph accurately depicted the gas station that night. Govada confirmed that the gas station had a surveillance camera system and that the cameras activate upon motion detection. At approximately 10:56 p.m., a customer entered the gas station. Govada recognized the customer as defendant and identified him in court. Govada stated that he had seen defendant previously at the gas station while he worked there.

¶ 29     The State introduced exhibit 35, which was a DVD recording containing surveillance footage from the gas station on October 6, 2020. The exhibit was admitted without objection and published to the jury. Govada described the recording and identified defendant when he appeared on the video. The recording did not contain audio.

¶ 30     Govada described defendant's behavior that night as "restless," "[u]neasy," and "[a]nxious." He also stated that defendant's conduct was aggressive. Defendant presented a $100 bill to Govada and asked him to confirm whether it was fake. Govada checked the $100 bill and determined it was fake. He told defendant the money was fake, and defendant loudly disagreed with him. Defendant left the gas station and returned a few minutes later to purchase some items with a debit card. Govada also identified receipts from the gas station reflecting the transactions defendant made at the gas station that night with the debit card. Defendant purchased two packs

of cigarettes and a beverage, using two debit cards. Copies of the receipts were admitted into evidence without objection and published to the jury. On cross-examination, Govada testified that, when defendant entered the gas station, he wore a white T-shirt and was not wearing a hat, jacket, or hoodie.

¶ 31 Next, the parties stipulated to transactions made using Manella's debit card account at the gas station on October 6, 2020. The parties stipulated that the business records from Old Second National Bank were made in the regular course of business and were accurate depictions of financial activity from Manella's account number. Defendant signed the stipulation.

¶ 32 Detective Darryl Moore testified that he served as an officer with the Aurora police department for 26 years. He was assigned as the lead detective to investigate the incident. On October 8, 2020, he interviewed Manella, who gave him the pair of eyeglasses that were broken during the assault. Detective Moore identified State's exhibit 20, which was the eyeglasses. Detective Moore previously worked at Jennings Terrace as a custodian. He stated that he did not take fingerprints or collect any DNA from the scene because "[i]t's a public area" and "[t]here would be a lot of potential people touching those areas." Detective Moore stated that "trying to get elimination samples with that kind of area would be next to impossible." As lead detective, he does not attempt to collect fingerprints or DNA from every crime scene.

¶ 33 The State presented exhibit 32, which was a map depicting Jennings Terrace, the gas station, and the surrounding area. Exhibit 32 was admitted without objection and published to the jury. Detective Moore testified that the gas station was located about one-half mile from Jennings Terrace. He said that he interviewed Govada and reviewed two receipts and video surveillance from the gas station from October 6, 2020. Detective Moore identified defendant in court after viewing photographs showing him at the gas station that night. Based on Detective Moore's review

of the surveillance videos and other information obtained during the investigation, he generated a photo lineup. Detective Moore explained the procedure for creating the lineup and the independent administration of the lineup by an officer not actively involved in the investigation. The State presented exhibit 34, the photo lineup Manella viewed, which was admitted without objection. Detective Moore stated that defendant's picture was assigned as the fifth photograph of six potential suspects.

¶ 34    On November 6, 2020, Detective Moore interviewed defendant at the Kane County Judicial Center. Strict COVID-19 regulations required Detective Moore to conduct the interview in an "attorney room," where he sat on one side of a glass partition with defendant sitting on the other side, communicating by a phone attached to the wall on each side. Defendant agreed to talk to Detective Moore after the detective provided a *Miranda* warning. See *Miranda v. Arizona*, 384 U.S. 436 (1966)). The State presented exhibit 33 to the jury, which was a copy of the preprinted *Miranda* warning he provided to defendant, and it was admitted without objection. Defendant was unable to sign the form with the *Miranda* warning due to COVID-19 regulations. Detective Moore also explained that the interview was not recorded because he did not have the necessary equipment to record the conversation through the glass partition. In addition, he did not ask defendant to provide a written statement, because COVID-19 regulations precluded passing papers back and forth.

¶ 35    Detective Moore asked defendant about an incident at a gas station on October 6, 2020. Defendant told Detective Moore that he could not recall if he purchased anything there that night. Defendant frequently bought items from that gas station because he resided across the street. At that point during Detective Moore's testimony, he identified defendant in court and stated that defendant was wearing a white face mask.

¶ 36    Detective Moore asked defendant questions regarding whether he was with another male at the gas station on October 6. Defendant said he remembered being at the gas station with another male whom Detective Moore had described to him. Detective Moore showed defendant some photo clips that he had taken from the surveillance video. Defendant acknowledged that he was depicted in the photograph from the surveillance video. When Detective Moore asked defendant if he still had the shirt he was wearing in the surveillance video, defendant responded that he no longer had the shirt because "his girlfriend had a bloody nose and the shirt had blood on it." Defendant had thrown the shirt away.

¶ 37    Defendant told Detective Moore that he had bought some cigarettes, a soft drink, and chips at the gas station that night. Detective Moore asked defendant whether he had used a debit card that did not belong to him in order to pay for the items. Defendant acknowledged that the card did not belong to him, but he stated that he had received the card from a person named Gaylon Greene. Defendant acknowledged using two different cards for the purchases at the gas station that night. Defendant told Detective Moore that he had received the Old Second National Bank debit card from Greene and had found another card "on the gas pumps as he was entering the gas station." Defendant explained that Greene gave him the debit card because he owed defendant money. Defendant acknowledged that he had tried to pay for the transaction with a $100 bill, but the cashier thought the money was fake and denied the transaction.

¶ 38    Defendant told Detective Moore that Greene had given him permission to use the Old Second National Bank debit card. Detective Moore asked defendant whose name was embossed on the card. Defendant could not recall, but he told the detective that the name began with the letter "R," and he believed it may have been either "Robert or Ronald." Greene told defendant the pin number for the card. Defendant told Detective Moore that he used the card twice that night. He

also told the detective that Greene had given him the card near a park on Titsworth Court, which is located in between Jennings Terrace and the gas station. Defendant was with his girlfriend, Lisa Reynolds, at the park, and Greene told him that he had $1500 in his wallet, along with the card.

¶ 39 Detective Moore testified that he told defendant that the owner of the Old Second National Bank card resided at Jennings Terrace. Defendant told the detective that Greene "must have found it or taken the card." At that point, Detective Moore informed defendant that Manella had identified him in a photo lineup as the person who took his wallet. Defendant responded that he did not rob anyone. Detective Moore told defendant that he had viewed a surveillance video from Jennings Terrace, even though that was a lie. Detective Moore explained that this was an investigation tactic and "sometimes people don't tell me the truth and sometimes I just want to see what their response is if I tell them something that may show that I have some evidence that puts them in an area that they may be, or some maybe don't." Detective Moore also told defendant the lie that "some people from Jennings [said] that the victim can be kind of an asshole sometimes, so maybe the victim said something to the defendant." The detective explained he "wanted to see if the defendant would tell me and be more honest with what he knew about the wallet, the card, if he thought that maybe there's a reason the whole thing was going to be mitigated." Detective Moore stated that, at that point, defendant decided to tell him what actually happened that night.

¶ 40 Defendant told Detective Moore that he was with Greene and that they were walking towards Jennings Terrace. They approached the gazebo area where the residents commonly smoke, and he was approached by Manella at that time. According to defendant, Manella called him the "n" word and, in response, defendant punched him. Greene picked up Manella's wallet and later gave defendant the wallet. Detective Moore then made the statement, also a lie, that only he and Manella were in the surveillance video. Defendant then changed the story again and told the

detective that he had approached Manella and Manella had called him the "n" word. He punched Manella and "then [Greene] must have came [*sic*] by later and picked up the wallet." Defendant again denied that he had robbed anyone.

¶ 41 Defendant then provided a different scenario to Detective Moore, saying that he and Reynolds had approached the gazebo because she was looking for a cigarette butt. Manella approached Reynolds. Defendant told the detective that Manella had called Reynolds "a little bitch." In response, defendant punched Manella and left. Greene found Manella's wallet later. Detective Moore told defendant that his story was difficult to believe. Defendant responded that "he doesn't rob old people." Detective Moore stated that he never mentioned robbery to defendant up until that point of the interview. He also had not mentioned Manella's age.

¶ 42 As Detective Moore continued the interview, he told defendant that "sometimes people's emotions can make them do things." Detective Moore testified that defendant became emotional at that point and "looked like he was about ready to cry." His voice began to choke up. Defendant then told Detective Moore that Reynolds was a prostitute and he found her giving oral sex to Manella. At that point, defendant punched Manella because he was upset. Defendant claimed that Reynolds took the wallet during the interaction with Manella. Defendant stated that the interaction occurred at the side of the building, which is why Detective Moore would not have seen what happened on surveillance video of Jennings Terrace. Defendant continued that, after he punched him, Manella began running towards the front doors of Jennings Terrace with his pants down. Defendant chased Manella towards the door, and that was when Manella called defendant the "n" word. Defendant told the detective he discovered what was happening because Reynolds "was gone for some time and he started walking and just happened to cross them." When Detective Moore asked defendant about interviewing Reynolds, defendant responded that he had bought her

a train ticket to Arizona and that he would not be able to find her. Defendant gave the detective a phone number for Reynolds. Detective Moore attempted to contact Reynolds for an interview, but she never returned the phone call.

¶ 43    Detective Moore testified that he did not interview Greene because he did not believe Greene had anything to do with the incident after defendant provided many different versions of what had happened on October 6, 2020. Defendant told the detective that he threw the wallet into a dumpster.

¶ 44    On cross-examination, Detective Moore stated that he did not test the debit cards for fingerprints or deoxyribonucleic acid (DNA). He also did not test Manella's broken eyeglasses for fingerprints or DNA. Manella's debit card had been used five separate times on the night of October 6, 2020, including twice at the gas station in amounts totaling $1.74 and $4.31. The card was used three more times for $32 at a different gas station. Detective Moore reviewed the surveillance video from the second gas station and did not see defendant in the video. In addition, an application called "Cash App" listed two withdrawals of $100 from Manella's account, which were transferred to an account of a "Sheila You."

¶ 45    Detective Moore testified that he was not present when Detective Koenings administered the photo lineup to Manella, but he watched the video of the lineup later. Detective Moore agreed that Manella initially ruled out photograph 5, which depicted defendant. Detective Moore had spoken to Manella after the independently administered lineup and Manella had told him "he could not rule out Number 5." The detective clarified that the conversation between himself and Manella occurred after the lineup viewing "and that was just Mr. Manella still speaking about the lineup when I met with him again." Detective Moore testified regarding a report he wrote concerning the

photo lineup, in which he wrote that Manella was uncertain of any identification, including the potential suspect in photograph 2.

¶ 46   According to Detective Moore, he was unable to record the interview with defendant at the Kane County Judicial Center due to COVID-19 regulations. Detective Moore destroyed the notes from his interview because he prepared a report afterwards and "always destroy[s] the notes after [he writes] the report." Detective Moore did not conduct any further investigation of Greene's involvement or whether he had a criminal record. Defense counsel asked the detective about all the lies he told defendant, and Detective Moore responded that he told the lies with the goal of finding out the truth. Detective Moore stated that lying to a potential suspect is an effective police tool to induce a confession. In his experience, suspects often will minimize or justify their actions in committing a crime. Detective Moore agreed that, as the interview with defendant progressed, the stories became more bizarre. In each of the stories, defendant denied taking Manella's wallet.

¶ 47   After Detective Moore's testimony, the State rested, and defendant moved for a directed verdict. The circuit court denied defendant's motion. Defendant presented a number of exhibits to the jury that were admitted without objection, but he did not testify during his case-in-chief.

¶ 48   Before closing argument, the circuit court instructed the jury, among other things, that the evidence it should consider consists "only of the testimony of the witnesses and the exhibits which the Court has received. You should consider all the evidence in the light of your own observations and experience in life." The court also instructed the jury that "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which are not based on the evidence should be disregarded."

¶ 49   As to the identification testimony, the circuit court instructed the jury:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including but not limited to the following: The opportunity the witness had to view the offender at the time of the offense, the witness' degree of attention at the time of the offense, and the witness' earlier description of the offender.

You have before you evidence that a witness made an identification of another individual, following a photographic lineup conducted by a law enforcement agency, relating to the offense charged in this case. It is for you to determine whether the witness made an identification, and if so, what weight should be given to that evidence.

In determining the weight to be given to this evidence, you should consider all the facts and circumstances under which the identification was made, including but not limited to the procedures used by the law enforcement agency."

¶ 50    Further, the circuit court instructed the jury regarding circumstantial evidence, stating that "[c]ircumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you, together with all the other evidence in this case, in arriving at your verdict."

¶ 51    During closing argument, the State contended that several factors supported defendant's knowledge that Manella was older than 60 years of age.[2] The State showed the jury a photograph

_____

[2]Of course, the State needed to prove only that defendant knew that Manella was age 60 years *or* older.

of Manella after the incident wearing a pair of slippers, arguing that defendant saw Manella standing in front of a nursing home having a cigarette. The State asked the jury,

> "[w]hy would somebody be standing in front of a nursing home in slippers, at night? Maybe because they live there. *** Elderly people live in the nursing home; people over the age of 60. So, ladies and gentlemen, common sense tells us that the defendant knew that Mr. Manella was over the age of 60."

The State also asked the jury to consider Manella's physical appearance as evidence that "any person should know, in looking at Mr. Manella, that he is over 60." The State also commented to the jury,

> "You can see Mr. Manella. You saw him when he walked into court. You can consider all of that; your observations of his physical appearance, your observations of how he moved. He's not a spry young man, unfortunately. He did not move well. It took him a while to walk from the back of the courtroom to the witness stand. You saw that."

Further, the State argued that defendant told Detective Moore that "he's never robbed old people before," as an example of how he knew Manella was a person 60 years of age or older.

¶ 52    In his closing argument, with respect to the element of defendant's knowledge that Manella was age 60 or over, defense counsel argued: "The robber, whoever he is, could have not known that Robert Manella was over 60 years old. Does he look over 60 years old? Yes. Is he living in a nursing home, which means he probably is over 60 years old? Sure. But there are 50-year-olds living in nursing homes that look older that have gray hair. So whoever the robber is, they can't prove that the robber knew that Robert was over 60."

¶ 53 During the middle of closing argument, defense counsel requested that defendant be permitted to stand up and take off his mask. The circuit court denied the request, stating, "[n]ot in evidence."

¶ 54 The jury found defendant guilty of two counts of aggravated battery for causing bodily harm to a victim aged 60 or older and making physical contact with a victim aged 60 or older. These two convictions were merged. The jury found defendant not guilty of robbery of a victim 60 years of age or older.

¶ 55 Defendant filed a combined motion for judgment notwithstanding the verdict and for a new trial. He argued that the State had failed to prove that he knew Manella was aged 60 or older beyond a reasonable doubt. The circuit court denied defendant's motion, finding:

"[A]s to the judgment [notwithstanding] the verdict, I listened to the evidence, the jury has rendered their decision and I know that I issued the circumstantial evidence jury instruction. I believe that the jury verdict will stand. There is enough circumstantial evidence in the light most favorable to the State at this point that the jury could easily believe that the victim was over 60—could easily believe the defendant believed the victim was over 60 when this act occurred, and therefore, on the issue, I will deny the motion."

¶ 56 The circuit court sentenced defendant to 10 years' imprisonment. Defendant was given credit for time served, including an additional 525 days' credit and credit for participation in a substance abuse program. This appeal followed.

¶ 57                                    II. ANALYSIS

¶ 58 Defendant argues on appeal that (1) his conviction of aggravated battery must be reduced to misdemeanor battery because the State failed to prove he knew that Manella was at least 60 years of age; (2) he was denied a fair trial when the circuit court refused to allow him to remove

his mandated protective mask in front of the jury during closing argument to support his misidentification defense or, alternatively, he received ineffective assistance of trial counsel for failing to submit his appearance into evidence during his case-in-chief or request the reopening of his case for that purpose; and (3) he is entitled to a new trial due to the faulty photo lineup procedure or, alternatively, trial counsel was ineffective for failing to object to testimony regarding this procedure. We address each issue in turn.

¶ 59                    A. Sufficiency of the Evidence for Aggravated Battery

¶ 60    Defendant first contends that the State failed to introduce any evidence at trial that he knew Manella was 60 years of age or older. For example, the State asserted during closing argument that defendant "must have known" Manella was 60 years of age or older based on his appearance, mobility, and residence in an assisted-living facility. In other words, the State argued that defendant *should have known* Manella's age based on certain factors present at the time of the assault. However, defendant argues the State never alleged that defendant either knew Manella or knew anything about his actual age on the night of the assault. Instead, the State continually argued that the incident was a "random attack." Defendant contends that, under section 12-3.05(d)(1) of the Code (720 ILCS 5/12-3.05(d)(1) (West 2020)), he was required to have actual knowledge that Manella was 60 years of age or older. According to defendant, the State failed to prove this element and therefore, he argues, his aggravated battery conviction should be reduced to misdemeanor battery.

¶ 61    A challenge to the sufficiency of the evidence requires the reviewing court to determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443

U.S. 307, 319 (1979)). "That standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the trier of fact on issues that involve the credibility of the witnesses and the weight of the evidence." *People v. Jones*, 2019 IL App (1st) 170478, ¶ 25.

¶ 62     We draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43) and do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens*, 237 Ill. 2d 311, 334 (2010).

¶ 63     "Thus, it is our duty in the case at bar to carefully examine the evidence while giving due consideration to the fact that the court and jury saw and heard the witnesses." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). As our supreme court has observed, " '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). "If, however, after such consideration we are of the opinion that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, we must reverse the conviction." *Smith*, 185 Ill. 2d at 541 (citing *People v. Bartall*, 98 Ill. 2d 294, 306 (1983)).

¶ 64     Section 12-3.05(d)(1) of the Code provides that "[a] person commits aggravated battery when, in committing a battery, other than by discharge of a firearm, he or she knows the individual battered to be *** [a] person 60 years of age or older." 720 ILCS 5/12-3.05(d)(1) (West 2020). This court in *People v. Jasoni*, 2012 IL App (2d) 110217, ¶¶ 16-18, held that the plain language

of the statute "makes clear that the General Assembly intended a defendant to know that the individual he or she battered was 60 years of age or older in order to be convicted of aggravated battery based on this section." This conclusion is further bolstered by the intent of the legislature in enacting the aggravating element in section 12-3.05(d)(1) of the Code. *Id.*

¶ 65    The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature, "the surest and most reliable indicator of which is the statutory language itself, given its plain and ordinary meaning." *People v. Perry*, 224 Ill. 2d 312, 323 (2007). If the statutory language is clear and unambiguous, we must apply it as written, without using extrinsic aids to statutory construction. *Id.* We may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the expressed intent. *Id.* at 323-24. Since all provisions of a statutory enactment are viewed as a whole, we do not construe words and phrases in isolation; instead, they are interpreted in light of other relevant portions of the statute. *Carver v. Sheriff of La Salle County*, 203 Ill. 2d 497, 507-08 (2003). We further presume that the legislature did not intend absurdity, inconvenience, or injustice. *Id.* at 508. We review *de novo* the construction of a statute. *Perry*, 224 Ill. 2d at 324.

¶ 66    This court in *Jasoni* explained that the "earlier version of the statute was interpreted to mean that, as long as the victim was 60 years of age or older and the defendant committed a battery, the defendant was guilty of aggravated battery." *Jasoni*, 2012 IL App (2d) 110217, ¶ 14; see 720 ILCS 5/12-4(b)(10) (West 2004) (before the statute was amended, a person committed aggravated battery if he "[k]nowingly and without legal justification and by any means cause[d] bodily harm to an individual of 60 years of age or older"); see also *People v. Jordan*, 102 Ill. App. 3d 1136, 1139 (1981) (noting that the legislature had specifically rejected an amendment requiring knowledge of the victim's age because *scienter* would be too difficult to prove). In 2006, the

General Assembly amended the aggravated battery statute to its present form, which specifies that a person commits the offense when he or she "[k]nows the individual harmed to be an individual of 60 years of age or older." 720 ILCS 5/12-4(b)(10) (West 2006). In Jasoni, we compared the wording of the previous and current versions of the statute and found that, after the amendment, "the plain language of the statute requires that a defendant know that the person he or she batters is 60 years of age or older at the time of the battery in order to sustain a charge of aggravated battery under this section." *Jasoni*, 2012 IL App (2d) 110217, ¶ 16.

¶ 67 Knowledge, which is the mental element of the offense, is often proven by circumstantial evidence. *Id.* ¶ 20 (citing *People v. Faginkrantz*, 21 Ill. 2d 75, 80 (1960)). Section 4-5(a) of the Code states that "[a] person knows, or acts knowingly or with knowledge of *** [t]he nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist." 720 ILCS 5/4-5(a) (West 2020). "Knowledge of a material fact includes awareness of the substantial probability that the fact exists." *Id.* Our courts have previously explained that, " '[b]ecause of its very nature, the mental element of an offense, such as knowledge, is ordinarily established by circumstantial evidence rather than direct proof.' " *Jasoni*, 2012 IL App (2d) 110217, ¶ 20 (quoting *People v. Farrokhi*, 91 Ill. App. 3d 421, 427 (1980)); see *People v. Leib*, 2022 IL 126645, ¶ 37 ("Knowledge is often proven by circumstantial evidence rather than direct proof because it is the mental element of an offense and, as such, is rarely proven by direct evidence."). "An admission by a defendant is not required for the trier of fact to conclude that a defendant had knowledge of something." *Jasoni*, 2012 IL App (2d) 110217, ¶ 20; see *Leib*, 2022 IL 126645, ¶ 37 (same).

¶ 68    In *Jasoni*, the defendant argued that the evidence in his case was insufficient to prove he knew the victim was at least 60 years of age when the battery occurred. He contended that all the evidence of his guilt was circumstantial and that none of it supported the inference that he knew the victim was 60 years of age or older. However, the court in *Jasoni* found that, when construing the evidence in the light most favorable to the State, ample evidence supported the aggravated battery conviction. The defendant had known the victim for 20 years at the time of the assault, as he had been married to the victim's daughter for 14 years. The defendant's son was the victim's grandson, and the victim frequently visited the defendant's home to see her grandson. In addition, the defendant lived in an apartment leased to him by the victim, which further demonstrated his close relationship to the victim. Finally, the victim was aged 68 at the time of the assault, well over the statutory minimum, and therefore, the trier of fact had an opportunity to observe her appearance and assess whether it provided an indication of her age. The *Jasoni* court concluded that the circumstantial evidence provided "an adequate basis for a conclusion that defendant knew [the victim] well, which, in turn, supports an inference that he knew she was at least 60 years of age." *Jasoni*, 2012 IL App (2d) 110217, ¶ 24.

¶ 69    Defendant in this case argues that we should follow *People v. Smith*, 2015 IL App (4th) 131020, ¶ 47 (*Lorenzo Smith*), in which this court found that the evidence was insufficient to support the defendant's conviction of aggravated battery. The *Lorenzo Smith* court noted that the State, in arguing that the evidence was sufficient, inferred that the defendant and the victim shared a close relationship, because of their long-term friendship and status as roommates at the time the offense was committed. *Id.* ¶ 45. The State also inferred that the defendant must have known the victim's age because he and the victim had filled out joint rental applications. *Id.* In addition, the State presented evidence that the defendant's role as the victim's caregiver created the inference

that he would have had access to information regarding the victim's age. *Id.* Finally, the State inferred that the victim's willingness to provide the defendant with his debit card PIN number suggested a trusting relationship wherein the two would have shared their ages with one another. *Id.*

¶ 70 The *Lorenzo Smith* court found that the State had "pyramided intervening inferences in an attempt to create evidence not otherwise contained in the record." *Id.* ¶ 46. The court stated that nothing in the record suggested that the defendant was aware of the victim's age. *Id.* The victim did not testify that he told the defendant his age or birth date, nor did they celebrate the victim's birthday while they were roommates. *Id.* The court also found that the record was devoid of evidence showing that the defendant had reviewed the portions of the victim's rental applications, medical records, or any other documents in the apartment that might have reflected the victim's age or birth date. *Id.* The court held that the State failed to present evidence from which the jury could infer that the defendant knew the victim was at least 60 years of age, and the court vacated the defendant's conviction of aggravated battery. *Id.* ¶ 47.

¶ 71 In this case, we decline to follow the Fourth District's decision in *Lorenzo Smith*. This court is not bound by the decisions of other districts of the appellate court. See *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) ("[T]he opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels."); *Schramer v. Tiger Athletic Ass'n of Aurora*, 351 Ill. App. 3d 1016, 1020 (2004) (same).

¶ 72 Here, the State argues that the *Lorenzo Smith* court usurped the role of the jury because it reweighed the evidence and disregarded the strong circumstantial evidence that supported the jury's verdict. We agree. Our supreme court in *Collins* stated that it is our duty as the reviewing court to carefully examine the evidence "in the light most favorable to the prosecution" while

giving due consideration to the fact that the circuit court and the jury saw and heard the witnesses and viewed the evidence. (Internal quotation marks omitted.) *Collins*, 106 Ill. 2d at 261.

¶ 73   In any event, *Lorenzo Smith* is factually distinguishable from this case. In *Lorenzo Smith*, "[t]he sole evidence presented with respect to [the victim's] age was his own testimony that he was 63 years of age." 2015 IL App (4th) 131020, ¶ 44. Thereafter, the State presented circumstantial evidence to establish that the defendant knew of the victim's age. *Id.* The *Lorenzo Smith* court found that "[n]othing in the record suggests defendant was aware of [the victim's] age," and the victim "provided no testimony he told defendant his age or birth date, and during the brief period in which [they] were roommates, [the victim] did not celebrate a birthday." *Id.* ¶ 46. There, the State operated "on the mistaken belief that it needed only to prove [the victim] was over the age of 60," but it "presented no evidence from which a jury could infer *defendant* knew [the victim] was over the age of 60." (Emphasis in original.) *Id.* ¶ 47. Such is not the case here.

¶ 74   In contrast to both *Jasoni* and *Lorenzo Smith*, defendant and Manella certainly were not in a close relationship of any kind and, in fact, were not even acquainted with one another on the night of the assault. However, when viewing the evidence in the light most favorable to the State, as we must under *Collins*, we find that a rational trier of fact could conclude that defendant knew Manella was 60 years of age or older at the time of the battery. Considering the statutory definition of "knowledge" under section 4-5(a) of the Code, we find that a reasonable jury could conclude that Manella's appearance on the night of the assault, his communication to defendant that Jennings Terrace was "an old-folks home," and defendant's admission to Detective Moore that "he doesn't rob old people," supported his conviction of aggravated battery. Unlike *Lorenzo Smith*, the record here is replete with circumstantial evidence bolstering the inference that defendant knew Manella was at least 60 years of age. Significantly, the jury had an opportunity to observe

Manella's physical appearance, movements, and mannerisms. See *People v. Sanders*, 2021 IL App (3d) 190728-U, ¶ 26 (the trier of fact can properly make observations and draw inferences about the testifying victim's appearance, movements, and mannerisms when considering whether a defendant knew the victim's age); see also *People v. Daniels*, 139 Ill. App. 3d 475, 481 (1985) (the "in-court appearance of the victim is sufficient to rebut defendant's affirmative defense because the trier of fact has the best opportunity to observe the victim and assess the reasonableness of the defendant's belief" regarding the victim's age).

¶ 75    The jury in this case saw multiple photographs of how Jennings Terrace and Manella appeared on the night of the assault. The numerous, well-lit signs on the property would have made clear to defendant that he was pounding on the door of a nursing home. One sign specifically stated, "Assisted Lifestyle • Nursing Care." Signs taped to the doors of the facility he was attempting to enter stated, "All staff and visitors must report directly to Nurse's Station for temporary screening," as well as "Sorry, because of the risk of COVID to our residents and staff, there is no public bathroom available." Further, a sign taped to the door listed visitation information. In short, the jury viewed pictures clearly showing that Jennings Terrace was a nursing home.

¶ 76    Defendant argues that, because he was located on the "sheltered-care" side of the building when he attacked Manella, this somehow demonstrated he had no knowledge of Manella's age. Defendant contends that the State did not present any evidence that all residents of the building are 60 years of age or older. However, this was not required to establish aggravated battery of a victim aged 60 or older under section 12-3.05(d)(1) of the Code.

¶ 77    Indeed, Manella testified that defendant asked him multiple times if he was a resident at the facility. Manella responded each time, telling defendant that "this is an old-folks home and

there are nurses and CNAs in there, and if I go inside and tell them that you're out here and they call the police and the police catch you out here, you could be arrested for trespassing." Manella also told defendant that "visiting hours were over at 8." A rational trier of fact could find that this evidence supported the conclusion that defendant was standing at the entryway of a nursing home and knew Manella was at least 60 years of age.

¶ 78　　This inference is also supported by Manella's appearance that night, which the jury viewed in photographs taken following the assault. The photographs of Manella show that his hairline was receding, his hair was completely silver, the hair on his eyebrows was greying, and the stubble on his face was white. Manella testified that he was 68 years old at the time of trial, meaning he was 66 years old when the battery occurred. Furthermore, defendant himself told Detective Moore that "he doesn't rob old people," even though Detective Moore had not mentioned Manella's age during his interview with defendant. The lack of direct evidence of defendant's knowledge of Manella's age is no barrier to the trier of fact's conclusion that defendant possessed this knowledge. *Jasoni*, 2012 IL App (2d) 110217, ¶ 24. Moreover, we are mindful that the issue we review on appeal is not whether defendant actually knew that Manella was 60 years of age or older, but whether a rational finder of fact could conclude beyond a reasonable doubt that defendant knew Manella was 60 years of age or older. See *Collins*, 106 Ill. 2d at 261 (the relevant question is whether, viewing the evidence in the light most favorable to the prosecution, any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt). Indeed, the exchange between defendant and Manella in front of Jennings Terrace and Manella's appearance that night provided enough information for defendant to be aware of the substantial probability that Manella was 60 years of age or older. 720 ILCS 5/4-5(a) (West 2020). Manella was 66 years of age at the time of the battery, had silver hair beyond his ears in length, had white

stubble on his face, and specifically told defendant three times that Jennings Terrace was "an old-folks home."

¶ 79    Simply put, the resolution of defendant's guilt or innocence depended on the credibility of the witnesses and the weight given their testimony. *Collins*, 106 Ill. 2d at 261. We will not substitute our judgment for the trier of fact on issues regarding the weight of the evidence or the credibility of the witnesses. *Siguenza-Brito*, 235 Ill. 2d at 224-25.

¶ 80    "Knowledge" under the plain language of the statute can be based on circumstantial evidence *or* direct evidence. *Jasoni*, 2012 IL App (2d) 110217, ¶ 20. Indeed, direct evidence of the victim's age is *not* required under the plain language of the statute. To hold otherwise would not only go against the plain language of the statute but also would lead to absurd results in contravention of legislative intent, namely, to protect individuals of 60 years of age or older. "The process of statutory interpretation should not be divorced from *** the 'real-world activity' [citation] that the statute is intended to regulate." *People v. Hanna*, 207 Ill. 2d 486, 502 (2003). "Further, in determining the intent of the legislature, a court 'may properly consider *not only the language of the statute*, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved,' " including the application of simple common sense. (Emphasis in original.) *Id.* (quoting *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002), citing *People v. Pullen*, 192 Ill. 2d 36, 42 (2000)); see *United States v. Kirby*, 74 U.S. 482, 487 (1868) (discussing application of common sense when the plain language of a law was not followed because doing so produced an absurd result).

¶ 81    In this case, applying defendant's interpretation of section 12-3.05(d)(1), an elderly battery victim would need to display some form of age-related identification to his or her attacker prior to being assaulted or mention his or her age, even if the outwardly elderly appearing victim happened

to be standing directly in front of a nursing home at the time of the battery. Defendant himself told Detective Moore that "he doesn't rob old people," which, under the interpretation defendant seeks, would mean that a true admission for aggravated battery under section 12-3.05(d)(1) instead required him to state he "doesn't rob a person 60 years of age or older." This absurd interpretation of the statute is impractical and inconsistent with the commonsense purpose of the statute—to protect elderly citizens in this State. Here, the jury viewed and heard circumstantial evidence establishing that defendant knew he assaulted an individual at least 60 years of age—including photographs of the location and of Manella from the date of the assault—and heard pertinent testimony that resulted in defendant's conviction of aggravated battery under section 12-3.05(d)(1). In sum, we hold that there was sufficient evidence for the trier of fact to find that defendant knew Manella was 60 years of age or older at the time of the battery. After viewing the evidence in the light most favorable to the State, we find that the trier of fact could have found the essential elements of section 12-3.05(d)(1) beyond a reasonable doubt.

¶ 82     We must also address the dissent's central theme—that one cannot judge a book by its cover—which relies on a misdefinition of "knowledge" along with the long-defunct requirement that every hypothesis consistent with innocence must be excluded before circumstantial evidence will be deemed sufficient to support a guilty verdict. Specifically, the dissent distorts the definition of knowledge by stating that the plain language of the statute requires that "defendant actually knew his victim was aged 60 or older." *Infra* ¶ 136. As our supreme court recently explained, "knowledge of a material fact includes awareness of the substantial probability that the fact exists." *Leib*, 2022 IL 126645, ¶ 37. If there is circumstantial evidence in the record from which a reasonable fact finder could find that defendant had an awareness of the substantial probability that Manella was age 60 or older, we will not disturb the jury's verdict. See *id.* ("if there is

circumstantial evidence in the record from which a reasonable fact-finder could find that [the] defendant had an awareness of the substantial probability that the St. Louis Avenue parking lot was part of the grounds of the Queen of Martyrs Parish school, then we will not disturb the circuit court's judgment"). "Knowledge is often proven by circumstantial evidence rather than direct proof because it is the mental element of an offense and, as such, is rarely proven by direct evidence." *Id.* (citing *Jasoni*, 2012 IL App (2d) 110217, ¶ 20, citing *Faginkrantz*, 21 Ill. 2d at 80). We do not require that a defendant make an express admission before the trier of fact can conclude that defendant had knowledge of something. *Id.*

¶ 83    Next, during closing argument, defense counsel acknowledged that Manella looked "over 60 years old." The dissent's book-cover theme fails because the jury "is not required to disregard inferences which flow normally from the evidence and to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Hall*, 194 Ill. 2d 305, 332 (2000). Even if there is evidence presented from which conflicting inferences could be drawn, it "is best left to the trier of fact for proper resolution." *People v. Campbell*, 146 Ill. 2d 363, 380 (1992).

¶ 84    Instead of leaving the matter soundly in the jury's hands for "proper resolution," the dissent engages in a piecemeal challenge to the evidence in order to substitute its judgment for that of the jury. For example, the dissent argues that "[r]eliance on outward appearances to determine age can be extremely unreliable," juxtaposing this remark with photographs of actors Wilford Brimley and Tom Cruise. Arguably, Brimley looked like he was in his 70s, which probably explains why he was chosen to play the part of someone in his 70s, yet, as the dissent gleefully points out, Brimley was only 49 years old at the time. Unlike Hollywood make-believe and artifice, Manella was, and looked like he was, well over 60 years old when defendant attacked him. As the circuit court

properly found, the jury could reasonably determine that defendant "believed the victim was over 60." While a book may not be properly judged by its cover, the dissent ignores both proper definitions and well-established authority in claiming that its view of the evidence should trump the jury's reasonable and careful deliberation.

¶ 85    B. Removal of Defendant's Mask During Closing Argument

¶ 86    Defendant next argues that he was denied a fair trial when the circuit court prohibited him from removing his mandated protective mask during closing argument. Defendant's trial was conducted when COVID-19 restrictions required masks to be worn in court; however, the circuit judge did not wear a mask during trial and attorneys were allowed to remove their masks while questioning witnesses. In addition, witnesses also were allowed to testify without wearing masks so that the jury could "see their face[s], judge their credibility," and understand them. Defendant did not testify at trial and the record does not make clear whether he ever removed his mask before the jury at trial, including during in-court witness identifications.

¶ 87    Defendant argues that the key issue in this case involves identification and that he was misidentified as the assailant. Manella never identified defendant in the photo lineup after the assault occurred or in court. He contends that he did not fit Manella's description and that, during closing argument, defense counsel requested that defendant lower his mask to contrast defendant's appearance in court with the description provided by Manella following the assault. He argues that, as a matter of first impression, a defendant's "readily-visible physical appearance as it is at trial is not 'evidence' as it is commonly understood and, therefore, the [court] violated his due process right to a fair trial in preventing the jury from looking at his unmasked face during closing argument." Alternatively, defendant contends that trial counsel was ineffective for failing to enter his appearance into evidence in a case that rested almost entirely on identification.

¶ 88    Defendant also acknowledges in his opening brief that this issue was not properly preserved for appellate review because trial counsel did not object to the circuit court's denial of his request to remove his mask during closing argument and did not raise the argument in a posttrial motion. Defendant argues that this issue should be reviewed under the plain-error doctrine because both of its prongs were met: the evidence was closely balanced and the error was so serious that it affected the fairness of the trial and the integrity of the judicial process.

¶ 89    The State agrees that defendant has forfeited review of this issue. Forfeiture aside, the State contends Manella never provided a description of his attacker's face and that the jury had the opportunity to view defendant's appearance through the evidence admitted at trial. As a result, defendant could not have been prejudiced by the court's decision under either prong of the plain-error doctrine.

¶ 90    The plain-error doctrine is codified in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967), which states, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Our supreme court has recognized that the plain-error doctrine is a "narrow and limited exception to the general waiver rule." (Internal quotation marks omitted.) *People v. Herron*, 215 Ill. 2d 167, 177 (2005). Plain errors may be noticed when a "clear or obvious error occurred" and "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or if the error is "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). A defendant raising a plain-error argument bears the burden of persuasion. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The first step in plain-

error analysis is to determine whether there was error at all. *People v. Walker*, 232 Ill. 2d 113, 124 (2009); *People v. Patterson*, 217 Ill. 2d 407, 444 (2005).

¶ 91      A criminal defendant has a right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. 1, § 8. A claim alleging ineffective assistance of counsel is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. Under *Strickland*, a defendant must prove both (1) deficient performance by counsel and (2) prejudice to the defendant. *People v. Colon*, 225 Ill. 2d 125, 135 (2007). To satisfy the first prong, a defendant must demonstrate counsel's performance was objectively unreasonable under prevailing norms. *People v. Domagala*, 2013 IL 113688, ¶ 36. "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *Perry*, 224 Ill. 2d at 341-42. To satisfy the second prong, prejudice is demonstrated if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome of the proceeding." *Colon*, 225 Ill. 2d at 135. The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697. If it is easier to dispose of an ineffective assistance claim on the ground of lack of sufficient prejudice, that course should be followed. *People v. Albanese*, 104 Ill. 2d 504, 527 (1984). Finally, counsel will not be deemed ineffective for failing to raise a meritless issue. *People v. Anderson*, 2013 IL App (2d) 111183, ¶ 65.

¶ 92      Thus, under either plain error or the ineffective assistance of counsel claim, we must first consider whether defendant's proposed issue has merit. See *People v. Cosby*, 231 Ill. 2d 262, 273 (2008) (on plain-error review, "[a]bsent reversible error, there can be no plain error"); *People v.*

*Mahaffey*, 194 Ill. 2d 154, 173 (2000) (the prejudice prong of the ineffective assistance of counsel test cannot be established when no error has occurred), *overruled on other grounds by People v. Wrice*, 2012 IL 111860. If the issue trial counsel failed to raise lacks merit, there is no basis for either plain error or an ineffective assistance of counsel claim. See *People v. Miller*, 2014 IL App (2d) 120873, ¶ 19 (citing *Cosby*, 231 Ill. 2d at 273).

¶ 93    With these principles in mind, we turn to whether the circuit court erred when it denied defense counsel's request to remove defendant's mandated protective mask during closing argument. Before delving into the substantive matter regarding this issue, we first take judicial notice that, on September 3, 2021, Governor JB Pritzker issued Executive Order 2021-22, which stated that, beginning on August 30, 2021, "all individuals in Illinois who are age two or over and able to medically tolerate a face covering (a mask or cloth face covering) shall be required to cover their nose and mouth with a face covering when in an indoor public place." Exec. Order No. 2021-22, 45 Ill. Reg. 11639 (Sept. 3, 2021), https://coronavirus.illinois.gov/ content/dam/soi/en/web/ illinois/documents/government/executive-order-2021-22.pdf [https://perma.cc/TKY6-YV9X]; see *People v. Henderson*, 171 Ill. 2d 124, 134 (1996) (noting the well-established rule that "courts may take judicial notice of matters which are commonly known or, if not commonly known, are readily verifiable from sources of indisputable accuracy"). Further, on September 2, 2021, our supreme court ordered that "[m]asks or face coverings should be worn at all times while in the courthouse unless the person is *** otherwise instructed by court personnel." See Ill. S. Ct., M.R. 30370 (eff. Sept. 2, 2021); see also 19th Judicial Cir. Ct. Adm. Order 21-21 (July 26, 2021) ("All criminal jury trials shall be governed by Illinois Supreme Court order M.R. 30370 ***."). The trial in this case commenced on December 13, 2021, and concluded on December 15, 2021, while the governor's executive order and the supreme court's order remained in effect. See Exec. Order No.

2021-32, 45 Ill. Reg. 16433 (Dec. 10, 2021), https://coronavirus.illinois.gov/content/ dam/soi/ en/web/illinois/documents/government/executive-order-2021-32.pdf [https://perma.cc/LH2Z-YDSK]; see also Ill. S. Ct., M.R. 30370 (eff. Sept. 2, 2021); 19th Judicial Cir. Ct. Adm. Order 21-21 (July 26, 2021).

¶ 94    Although defendant characterizes the denial of his request to remove his mask during closing argument as having precluded his due process right to a fair trial, defendant instead is essentially challenging the sufficiency of the evidence regarding his identification when he asserts the alleged inconsistencies between Manella's description and his own physical appearance. However, we find that defendant's request to remove his mask during closing argument instead of prior to the close of evidence is crucial to the disposition of this appeal.

¶ 95    Our federal and state constitutions guarantee criminal defendants a meaningful opportunity to present a complete defense. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. 1, § 8; *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 104. The sixth amendment to the United States Constitution and article 1, section 8, of the Illinois Constitution guarantee a defendant the right to confront the witnesses against him or her. U.S. Const., amend. VI; Ill. Const. 1970, art. 1, § 8. The crux of this right is the ability of a defendant to cross-examine adversarial witnesses. See *People v. Lofton*, 194 Ill. 2d 40, 53 (2000) (citing *Maryland v. Craig*, 497 U.S. 836, 844 (1990)). The defendant's due process rights are also potentially implicated because depriving the defendant of the opportunity to cross-examine the witnesses against him or her is a denial of the guarantee of due process as provided by the fourteenth amendment to the United States Constitution. U.S. Const., amend. XIV; see *Pointer v. Texas*, 380 U.S. 400, 405 (1965) ("to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law"); *People*

*v. Triplett*, 108 Ill. 2d 463, 474-75 (1985) (the right to confront witnesses "has been made obligatory on the States through the fourteenth amendment [citation] and includes the right to cross-examine a witness as to the witness' biases, interests, or motives to testify"). An individual's right to procedural due process entitles him or her to "the opportunity to be heard at a meaningful time and in a meaningful manner." *In re D.W.*, 214 Ill. 2d 289, 316 (2005). However, these constitutional rights do not entitle a defendant to present his or her desired defense, unrebutted, in whatever fashion the defendant chooses.

¶ 96 "Closing arguments are not evidence, and any argument that is not based in evidence should be disregarded." *People v. Sanders*, 2020 IL App (3d) 180215, ¶ 13. Our supreme court has held that "[i]t is improper to argue assumptions or facts not based upon the evidence in the record" and that defense attorneys are expected "to adhere to the same rules we apply to prosecutors." *People v. Johnson*, 208 Ill. 2d 53, 115 (2003). During closing argument, a party is precluded from attempting to relitigate an issue before the jury. *Id.* at 116.

¶ 97 Here, defendant had numerous, meaningful opportunities prior to closing argument to challenge the State's evidence identifying him as the assailant, during which he could have requested to remove his mask. For example, when defense counsel cross-examined Manella regarding defendant's appearance on the night of the assault, counsel did not ask defendant to remove his mask so that jurors could compare Manella's testimony with defendant's appearance in court. Indeed, defense counsel did not ask Manella any questions challenging his inability to positively identify defendant in the photo lineup or comparing defendant's appearance in the courtroom with the photographs from the lineup. Jurors viewed published photographs of defendant from the lineup and the surveillance videos depicting defendant at the gas station shortly

after the assault. In short, they viewed defendant as he appeared on the date of the assault when he was not wearing a mask.

¶ 98    Further, defendant also cross-examined Detective Moore to confront the identification issue, but counsel did not request the removal of defendant's mask at that point of the trial either. Finally, defendant did not request to remove his mask during his case-in-chief in an attempt to challenge whether he was misidentified, nor would doing so have implicated his fifth amendment protections. See U.S. Const., amend. V (no person shall be compelled to testify against himself in a criminal case); Ill. Const. 1970, art. I, § 10 (same).

¶ 99    In this case, defendant's trial provided him with the necessary due process to contest his identification by means of removing his mask, but he chose not to request to do so until after the close of evidence. Indeed, defendant argues in his opening brief that "counsel should have been able to request the jury to look at [defendant's] physical appearance as it was *during the trial* in order to argue that [he] was not guilty." (Emphasis added.) Defendant was permitted to cross-examine the witnesses fully as to the accuracy of their identifications. If identification was indeed the key issue in this case as defendant asserts, the trial provided many meaningful opportunities to contest that identification prior to the close of evidence. The jury was not precluded from viewing defendant's appearance as defendant contends. It was the jury's responsibility to weigh the witnesses' credibility in light of any contradictory evidence or challenges to their credibility, including the identification of defendant as the offender. *People v. Gray*, 2017 IL 120958, ¶¶ 35-36. Instead, defendant simply failed to request the removal of his mask before the close of evidence at trial, when, as discussed in detail above, it would have been appropriate for him to challenge the evidence of his identification.

¶ 100  Defendant now seeks to argue his "novel" theory that his physical appearance was not "evidence," to circumvent the rule that closing argument is not evidence. The circuit court specifically instructed the jury that "[n]either opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which are not based on the evidence should be disregarded." The jury had the opportunity to consider the evidence and weigh the identification testimony, including Manella's opportunity to view the offender at the time of the offense, his degree of attention at the time of the offense, and his description of the offender. In short, defendant improperly attempted to present evidence during closing argument when evidence was no longer supposed to be presented and could not be considered by the jury. We reject his argument that his "readily-visible physical appearance" at trial should not be considered "evidence" during closing, because he was clearly attempting to compare his appearance at trial with evidence that had already been presented, namely, Manella's description of the offender.

¶ 101  Further, defendant cites extrajurisdictional cases in support of his argument, all of which involved trials where juries were afforded the opportunity to compare the appearance of the offender at the time of the offense to that of the defendant in court *prior to the close of evidence*.[3] See, *e.g.*, *United States v. Owens*, 445 F. App'x 209, 216 (11th Cir. 2011) (finding the jury had the opportunity to view videos and screenshots of the offender during trial and, on a sufficiency of the evidence argument, the defendant failed to show that "no reasonable juror could have concluded that he was [the offender]"); *State v. Orr*, No. M2015-00690-CCA-R3-CD, 2016 WL 1403982 (Tenn. Crim. App. 2016) (holding the jury had sufficient corroborating evidence to identify the

---

[3]This court is not bound by federal or out-of-state decisions other than, in appropriate cases, those of the United States Supreme Court. *People v. Fern*, 240 Ill. App. 3d 1031, 1039-40 (1993).

defendant as the offender when they observed the appearance of the offender in the video and compared it to the witness's description and the in-court appearance of the defendant); *State v. Percy*, 48,922, p. 6-7 (La. App. 2 Cir. 4/9/14); 137 So. 3d 184, 188 (La. Ct. App. 2014) (concluding that the State proved the defendant's identity as the offender beyond a reasonable doubt by introducing two color photographs of the offender's face taken from a surveillance video, which were corroborated by a witness, and the defendant's presence at trial, which afforded the jury an opportunity to compare the appearance of the person in the photographs to that of the defendant). As in these extrajurisdictional cases, defendant was provided with meaningful opportunities to confront any discrepancies between his appearance on the night of the offense and his appearance in court. It was within the province of the jury to decide whether the offender portrayed in the surveillance video and described by Manella was the same individual. We will not disturb the jury's decision. *Gray*, 2017 IL 120958, ¶¶ 35-36 ("A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." (citing *Siguenza-Brito*, 235 Ill. 2d at 228)).

¶ 102   Likewise, *People v. Smith*, 256 Ill. App. 3d 610 (1994) (*Raymond Smith*), another case upon which defendant relies, is inapplicable, as it involves the issue of whether the State argued improper hearsay testimony during closing argument, which is not at issue in this case. Defendant correctly points out that, in *Raymond Smith*, there were significant discrepancies between the victims' descriptions of the offender shortly after the robbery in comparison to the defendant's physical appearance at trial. However, the *Raymond Smith* court noted these discrepancies in *dicta* only to point out that the State's evidence against the defendant was not as overwhelming as the State had argued. See *id.* at 616 ("We mention [the discrepancies] only to illustrate that the

evidence of defendant's guilt was not as overwhelming as the State suggests."). Defendant's reliance upon *Raymond Smith* here is unavailing.

¶ 103   In sum, we reject defendant's argument and find that the circuit court did not err when it denied defendant's request to remove his mask during closing argument. Because we find no error and no due process violation, we need not address defendant's plain-error argument or ineffective assistance of counsel claim based on those grounds. See *People v. Johnson*, 218 Ill. 2d 125, 139 (2005) (when no error occurs, there can be no plain error and counsel cannot be ineffective for failing to raise the issue).

¶ 104                    C. Pretrial Identification Procedures

¶ 105   Finally, defendant argues that the pretrial identification procedures used in this case were so fundamentally unfair that he was deprived of a fair trial. Defendant acknowledges in his opening brief that "some of the lineup was in compliance with the statute as it was given by an independent administrator and was video recorded." Defendant claims that, after Detective Koenings declared the photo lineup complete and turned off the video recording, Detective Moore continued the lineup "behind closed doors" with no audio or video recording. Defendant argues that Detective Moore's testimony regarding the unrecorded portions of the lineup directly contradicted the recorded portions of the lineup to the extent that Manella could no longer exclude defendant as the assailant. Because the continuation of the lineup was unrecorded, the record does not reflect what Detective Moore told Manella in order to convince Manella to change his mind about identifying defendant in the lineup. Further, defendant argues that the State used Detective Moore's testimony during closing argument to mitigate the damage caused by both Manella "clearly and definitively excluding [defendant] in the recorded lineup" and the fact that he did not fit Manella's description of the assailant.

¶ 106 Defendant acknowledges that defense counsel failed to object to Detective Moore's testimony and that this issue is not preserved for review. Defendant nevertheless argues that Detective Moore's testimony regarding the unrecorded continuation of the lineup was so egregious that this court should consider this issue under either plain error or as an ineffective assistance of counsel claim.

¶ 107 The State responds that defendant mischaracterizes the events surrounding the photo lineup and the evidence derived therefrom. The State contends that the evidence at trial showed defendant wore a hat and a "hoodie" during the attack and broke Manella's glasses, making the identification process at the police station more difficult for Manella. The State argues that this is not a case of improper identification, because no positive identification occurred. During closing argument, the State told the jury that Manella made no specific identification and that they had to look to other evidence to infer that defendant was the perpetrator. Contrary to defendant's assertion, Manella did not definitively exclude defendant during the photo lineup and then change his mind abruptly afterward while speaking with Detective Moore. The State contends that Manella "struggled" with shifting uncertainties, had difficulty observing the potential suspects in the photo lineup, and did not identify anyone as the perpetrator. According to the State, Manella's interactions with Detective Moore after the photo lineup reflected the same struggles and shifting uncertainties, and he did not identify anyone as the perpetrator at that point either.

¶ 108 The State further argues that, contrary to defendant's assertions, Manella's description of the perpetrator was absolutely consistent with defendant's physical appearance, considering his gender, race, height, and build at the time the offense occurred. The State contends that defendant's appearance in the surveillance footage of defendant entering the gas station shortly after the offense was consistent with Manella's description of the perpetrator. The State also maintains that the

surveillance video shows defendant behaving anxiously, "constantly checking the front door for police as if he had just committed a crime." The State contends that no error occurred in the identification procedures and, because the evidence against defendant was overwhelming, he cannot establish prejudice by the inconclusive result of the photo lineup.

¶ 109    As previously discussed, the first step in plain-error analysis is to determine whether any error occurred. See *Thompson*, 238 Ill. 2d at 613. Under either plain error or as an ineffective assistance of counsel claim, we consider whether this issue has merit. See *Cosby*, 231 Ill. 2d at 273.

¶ 110    Defendant argues that the pretrial identification procedures were unduly suggestive because the lead detective continued the lineup procedures after the independent administrator concluded the lineup and had turned off the audio and video recording. Defendant characterizes the State's response in his reply brief, stating, "according to the State, it is permissible to conduct an inherently coercive lineup procedure so long as it does not lead to a 100% clear-cut identification." Defendant emphasizes that Manella specifically excluded him as the perpetrator during the video-recorded portion of the lineup but that Detective Moore continued the lineup off camera and Manella changed his mind to the extent he could no longer exclude defendant.

¶ 111    "The defendant bears the burden of proving that a pretrial identification was impermissibly suggestive." *People v. Ortiz*, 2017 IL App (1st) 142559, ¶ 22 (citing *People v. Brooks*, 187 Ill. 2d 91, 126 (1999)). Illinois courts utilize a two-prong test to determine whether a witness's identification was so tainted by suggestive identification procedures that its admission at the defendant's trial violated due process. *People v. McTush*, 81 Ill. 2d 513, 520-21 (1980). Initially, the court must determine whether the pretrial identification procedures were suggestive, and, if so, the court must then determine whether the identification testimony was so tainted as to make it

unreliable. *Ortiz*, 2017 IL App (1st) 142559, ¶ 22 (citing *McTush*, 81 Ill. 2d at 520-21). The defendant must show that "the confrontation was so unnecessarily suggestive and conducive to irreparable misidentification that [the defendant] was denied due process of law." *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003).

¶ 112    First, we cannot determine whether defendant has established his burden of proving that the pretrial identification procedures were impermissibly suggestive, because the conversation between Detective Moore and Manella is *dehors* the record. Defendant acknowledges that the photo lineup conducted by Detective Koenings "was in compliance with the statute." During cross-examination of Detective Moore, he testified that he prepared the photo lineup viewed by Manella. Detective Moore stated that he was aware of the statute requiring an independent administrator to conduct the photo lineup. He understood that an independent administrator is required "because you don't want the person doing the lineup to in any way suggest who the suspect may or may not be." Detective Moore stated that he spoke to Manella after the photo lineup and that Manella "was still talking about the lineup and he said he could not rule out Number 5," the picture of defendant. Detective Moore testified, "that was just Mr. Manella still speaking about the lineup when I met with him again." Detective Moore then wrote in his investigative summary regarding the lineup that Manella "was not certain about any of them" as possible suspects.

¶ 113    However, the contents of the conversation between Detective Moore and Manella are not included in the record, other than the detective's trial testimony. There is no evidence that Detective Moore suggested or referred to defendant as a suspect during their conversation. Therefore, the issue of whether Detective Moore's conduct following the independently administered photo lineup amounted to an impermissibly suggestive lineup procedure is better suited for postconviction proceedings, where a more adequate record can be developed. See *People*

*v. Bew*, 228 Ill. 2d 122, 135 (2008) (finding the record on appeal was insufficient to address any of the defendant's alternative grounds for suppression and that the defendant instead may raise those grounds in a postconviction proceeding).

¶ 114 Nevertheless, even if we could determine whether the pretrial identification procedures were suggestive, defendant's argument would still fail the second prong of the two-part test, because Manella never made a positive identification. In this case, there is no basis for finding that a suggestive pretrial lineup procedure tainted an identification when the witness never made a positive identification of defendant. The purpose of the prohibition against suggestive pretrial identification procedures is to guard against positive identifications impelled by an impermissible and suggestive photograph or photospread. Here, no irreparable misidentification resulted from Manella's conversation with Detective Moore following the independently administered photo lineup. Manella also never made an in-court identification of defendant.

¶ 115 Further, even if, as defendant argues, Detective Moore's conversation with Manella following the independently administered photo lineup raised an impermissibly suggestive taint on the pretrial lineup procedure, the totality of the circumstances establish that the procedure was not "so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." See *Simmons v. United States*, 390 U.S. 377, 384 (1968) (finding that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside *** only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"; further, whether or not it was unnecessarily suggestive depends upon the totality of the circumstances); see also *People v. Kubat*, 94 Ill. 2d 437, 472 (1983). Indeed, even considering that defendant forfeited this issue on appeal, the

evidence in the record supports a reasonable inference that Manella had a sufficient opportunity to observe defendant before he was in police custody. See *People v. Frisby*, 160 Ill. App. 3d 19, 33 (1987) (citing *Neil v. Biggers*, 409 U.S. 188 (1972), and *People v. Manion*, 67 Ill. 2d 564 (1977)).

¶ 116 Generally, taint occurs when the witness is unable to see the assailant during the offense, followed by a suggestive lineup procedure. That is not what happened in this case.

¶ 117 Here, strong circumstantial evidence corroborated Manella's less-than-positive identification of defendant. See *People v. Jackson*, 2020 IL 124112, ¶¶ 64-75 (circumstantial evidence is sufficient to support a conviction, even when there are discrepancies and inconsistencies in the evidence). Manella had a close, unobstructed view of the offender at the time of the assault and was able to view his assailant prior to getting punched in the face and having his prescription glasses broken. He also conversed with the offender in close proximity immediately before the assault, repeatedly asking him whether he was an employee at Jennings Terrace and the offender responding multiple times, asking "if there was anybody inside." Indeed, the conversation between the two individuals progressed long enough that Manella told the offender three separate times that Jennings Terrace was "an old-folks home" and that he could be arrested for trespassing. The jury viewed the video recording of the photo lineup and heard Manella struggle to identify the offender, due to not having his prescription glasses. Illinois courts have long held that minor discrepancies in the description of the assailant will not defeat a positive identification by an identifying witness so long as that person had adequate and ample opportunity to make a first-hand observation. See, *e.g.*, *People v. Williams*, 118 Ill. 2d 407, 413-14 (1987) (witness's failure to mention the defendant's mustache and facial hair did not render her identification unreliable); *People v. Nims*, 156 Ill. App. 3d 115, 121 (1986) (victim's failure to mention the defendant's facial scars did not render her identification unreliable); *People v. Bias*, 131 Ill. App. 3d 98, 104-05

(1985) (recognizing that inaccuracies pertaining to the "presence or absence of a beard, mustache, or tattoo, whether the assailant had missing teeth, and the assailant's height, weight and complexion, do not render an identification utterly inadmissible"). Indeed, " '[t]he credibility of an identification does not rest upon the type of facial description or other physical features which the complaining witness is able to relate. [Citation.] It depends rather upon whether the witness had a full and adequate opportunity to observe the defendant.' " *People v. Robinson*, 206 Ill. App. 3d 1046, 1051 (1990) (quoting *People v. Witherspoon*, 33 Ill. App. 3d 12, 19-20 (1975)). Our supreme court has recognized that "[i]t has consistently been held that a witness is not expected or required to distinguish individual and separate features of a suspect in making an identification." *People v. Slim*, 127 Ill. 2d 302, 308-09 (1989).

¶ 118   While these differences in detail are to be considered by the trier of fact, courts have consistently recognized that even significant inaccuracies are not necessarily dispositive because witnesses are generally not trained to be careful observers, especially when under assault, as Manella was here. Indeed, "[c]onsidering that very few persons are trained or keen observers and considering the stress under which, in criminal cases particularly, impressions of witnesses have been formed, discrepancies of this character are not uncommon." *Id.* at 311 (and cases cited therein).

¶ 119   Here, although Manella's credibility may have been affected by his discrepancies, the jury heard him testify that he conversed with defendant and had a full opportunity to view him at the illuminated entrance of Jennings Terrace. We find that Manella's opportunity to view defendant during the offense and the degree of attention permitted were sufficiently reliable to negate any alleged suggestiveness on the part of Detective Moore during the photo lineup. It was the responsibility of the trier of fact to determine the witnesses' credibility and the weight to be given

their testimony and to resolve any inconsistencies and conflicts in the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006); see *People v. Herrett*, 137 Ill. 2d 195, 204 (1990) (finding a sufficient opportunity to view the defendant where witness testified that he observed "the assailant's face for several seconds when the robber reached down to cover his eyes with duct tape" and "his face was only two feet from the assailant's"). We will not substitute our judgment for that of the trier of fact on these matters. *Sutherland*, 223 Ill. 2d at 242. We reject defendant's argument that the pretrial identification procedures were so fundamentally unfair that he was deprived of a fair trial.

¶ 120                                    III. CONCLUSION

¶ 121    Based on the foregoing, we affirm defendant's conviction of aggravated battery under section 12-3.05(d)(1) of the Code (720 ILCS 5/12-3.05(d)(1) (West 2020)). The judgment of the circuit court of Kane County is affirmed.

¶ 122    Affirmed.

¶ 123    JUSTICE KENNEDY, dissenting:

¶ 124    Defendant is clearly the person who battered Manella. His own statements to police admitted as much. Thus, the issues raised in this appeal surrounding defendant's identity are largely beside the point. However, while I agree with the majority on those issues, I do not believe the circumstantial evidence presented at trial was sufficient to sustain a felony conviction. In particular, the State failed to prove defendant had knowledge of Manella's age. The majority essentially declares that a momentary interaction combined with the use of the term "old" by defendant and Manella constitute proof beyond a reasonable doubt that defendant knew Manella was "60 years of age or older" at the time of the offense. I dissent from this holding.

¶ 125   Since 2006, Illinois law has required the State to prove a defendant's knowledge of a victim's age in cases alleging felony aggravated battery to a person 60 years of age or older. 720 ILCS 5/12-3.05(d)(1) (West 2020); 720 ILCS 5/12-4(b)(1) (West 2006) (renumbered to section 12-3.05 by Pub. Act 96-1551, § 5 (eff. July 1, 2011)). Contrast this requirement with other criminal statutes that involve the age of a victim as an element of the offense but do not require a defendant to know the victim's age, instead enumerating, as one of many "aggravating circumstances [that may] exist during the commission of the offense," that "the victim is 60 years of age or older." See, *e.g.*, 720 ILCS 5/11-1.30(a)(5) (West 2020) (aggravated criminal sexual assault); *id.* § 11-1.60(a)(3) (aggravated criminal sexual abuse).[4] An observer may question the legislature's wisdom in adding this scienter requirement only to the aggravated battery statute when it comes to victims "age 60 or older," considering that it drastically limited the number of instances in which such a felony charge can be sustained, but the language of the amended statute is clear and unambiguous: the State must prove the defendant "[k]nows the individual harmed to be an individual of 60 years of age or older." 720 ILCS 5/12-4(b)(10) (West 2006). This quoted language is the entirety of the 2006 amendment, which replaced "[k]nowingly and without legal justification and by any means causes bodily harm to an individual of 60 years of age or older." Pub. Act 94-327, § 5 (eff. Jan. 1, 2006) (amending 720 ILCS 5/12-4(b)(10)). According to its proponents, the amendment was

---

[4]This approach is consistent with the strict liability found in other statutes concerning the age of victims. See, *e.g.*, 720 ILCS 5/11-1.40 (West 2020) (predatory criminal sexual assault of a child); *id.* § 11-1.50 (criminal sexual abuse). Other statutes employ a "knows or reasonably should know" standard (see *id.* § 11-20.1 (child pornography)) or "knowingly or recklessly" (*id.* § 12C-35 (tattooing body of a minor); *id.* § 12C-40 (piercing body of a minor)).

intended to expand the application of felony charges to insulting/provoking contact types of battery to persons aged 60 years and older. 94th Ill. Gen. Assem., House Judiciary II Committee Hearing, February 18, 2005 (taped debate on 94th Ill. Gen. Assem., House Bill 1106, 2005 Sess.) (in which a then-state's attorney testified that the bill "would protect senior citizens as a class from all battery offenses, not simply batteries which resulted in bodily harm"). But the express language of the bill also added a new knowledge requirement, replacing the strict liability in the prior version.[5] *Id.*; see *People v. Jasoni*, 2012 IL App (2d) 110217, ¶ 18 (holding that the amended statute "requires a defendant to know that the victim is 60 years of age or older at the time of the battery").

¶ 126 While a defendant's knowledge can certainly be proven by circumstantial evidence, the State must present sufficient evidence at trial from which a trier of fact may make reasonable inferences that a defendant had the requisite *mens rea* to support a felony conviction.[6] In this case, the evidence was wholly insufficient to prove defendant knew Manella was 60 years of age or older. The full extent of the evidence presented as to defendant's knowledge of Manella's age was as follows: (1) Manella told his assailant that the building he was trying to enter was "an old-folks

---

[5]Immediately after the motion was unanimously passed by the committee, a member of the committee noted for the record that "[t]he language [of the amended statute] does call for providing that you know the individual harmed to be an individual of the age 60 years of age or older." 94th Ill. Gen. Assem., House Judiciary II Committee Hearing, February 18, 2005 (taped debate on 94th Ill. Gen. Assem., House Bill 1106, 2005 Sess.).

[6]The majority mischaracterizes this statement as "the long-defunct requirement that every hypothesis consistent with innocence must be excluded." Rather, this is merely a sufficiency of the evidence requirement extant in all criminal cases.

home," (2) defendant made an unprompted statement to a detective that "I don't rob old people," (3) a photograph of Manella taken shortly after the battery showed his appearance at the time, and (4) a photograph of the sign outside the building entrance where the battery occurred was labeled "Jennings Terrace—South Entrance—Assisted Lifestyle." Taken in the light most favorable to the prosecution, these facts are insufficient to directly show or reasonably infer that defendant had actual knowledge that Manella was 60 years of age or older.

¶ 127   First, the use of the term "old-folks home" is not conclusive evidence, nor even indicative, of a specific minimum age of the building's residents. According to Manella's testimony at trial, defendant approached the entrance in question at approximately 10:30 p.m., which was a shift change for employees. In fact, a staff member had just entered that doorway when Manella first noticed defendant. According to Manella, "the lighting [was] not the greatest." Seeing defendant pounding on the doors, Manella approached and asked if he was a new employee. Defendant did not answer the question but asked Manella instead if there was anybody inside, to which Manella again asked if he was an employee; this exchange was repeated verbatim. Defendant then asked Manella, "are you a resident?" to which Manella responded by asking again if defendant was an employee; this exchange was also repeated. Then, "I finally told him. I said that, you know, this is an old-folks home and there are nurses and CNAs in there, and if I go inside and tell them that you're out here and they call the police and the police catch you out here, you could be arrested for trespassing." Defendant again asked if Manella was a resident, and Manella repeated his last statement. Manella then opened the door to go in, which he did with some difficulty, clarifying, "because of my disability, my—the weak left leg." At that point, defendant committed the battery in question, first by punching Manella in the face. Manella then described multiple blows followed by defendant removing Manella's wallet from his back pocket. The entire event, from Manella

first seeing defendant to the removal of his wallet,[7] took "a few minutes." Manella never positively identified defendant. In fact, at a photo lineup, Manella twice excluded defendant as "too old."

¶ 128   In summary, Manella told defendant it was an "old-folks home" three times and said there were nurses and CNAs inside, but he offered no other information as to his age or any age requirement to be a resident. Manella did not know defendant, and, based on the conversation, defendant clearly did not know Manella nor did he know whether Manella was a resident of the building. There was no conversation about Manella's age, Manella never told defendant he was 60 years of age or older, Manella did not tell defendant he was a resident, and the entire incident was so brief and in such poor lighting conditions that Manella could not positively identify defendant even though Manella was wearing prescription glasses at the time of the battery.

¶ 129   Thus, the sole piece of evidence from Manella's testimony that might have any bearing on what defendant might have known about Manella's age at the time of the battery was that Manella informed defendant it was an "old-folks home." From the term "old-folks home," the jury was left to infer (falsely) that only persons aged 60 years and older lived there—*and* that defendant knew as much. Furthermore, the jury would also have had to infer that defendant knew Manella was a resident, despite defendant's repeated and unanswered questions on that subject. These are exactly the sort of "pyramided [or] intervening inferences" the court warned against in *People v. Smith*, 2015 IL App (4th) 131020, ¶ 44 (*Lorenzo Smith*). The other evidence at trial regarding the age issue was either not probative or merely a continuation of this same inference stacking.

---

[7]Curiously, while defendant admitted to Detective Moore that he battered Manella and clearly possessed some contents of Manella's wallet at the gas station immediately afterward, the jury returned a verdict of not guilty as to the charge of robbery.

¶ 130   Regarding the second piece of evidence, the majority places great weight on defendant's statement to police that "I don't rob old people." But defendant's statement to Detective Moore was not in reference or response to any discussion of a number, nor did Detective Moore ask what age defendant thought Manella was or otherwise inquire further on the topic. Defendant's use of the general term "old people" has no more bearing on defendant's knowledge of Manella's actual age than does Manella's use of the term "old-folks home."

¶ 131   When a person is described as "old," to what age does that refer? Webster's Dictionary defines the term "old" in numerous ways, including "advanced in years" and "exhibiting the physical or mental characteristics of age," among other descriptors. Webster's Third International Dictionary 1569 (1986). Missing from the definition of "old" is any specific age or minimum number of years.

¶ 132   Rather than define a specific age or age threshold, the term "old" merely connotes a comparison, usually to the age of the person using the term: if a teenager were to describe someone age 50, they would probably use the term "old," but a 70-year-old person might describe that same 50-year-old as young. In fact, "[i]n 2016, the Marist Poll asked American adults if they thought a 65-year-old qualified as old. Sixty percent of the youngest respondents—those between 18 and 29—said yes, but that percentage declined the older respondents were; only 16 percent of adults 60 or older made the same judgment." Joe Pinsker, *When Does Someone Become "Old"?*, The Atlantic (January 27, 2020), https://www.theatlantic.com/family/archive/ 2020/01/old-people-older-elderly-middle-age/605590/ [https://perma.cc/86QY-8LF8]. In fact, AARP (formerly, the American Association for Retired Persons) is dedicated to the needs of the "50+ population." See AARP, https://www.aarp.org/membership/age-requirement/ [https://perma.cc/JXA6-AY3C] (last

visited Feb. 27, 2024). The use of the term "old people" by defendant does not correlate to a number, and it simply does not follow that "old" means "60 years of age or older."

¶ 133 Third, the majority essentially endorses the State's description of the photograph of Manella taken shortly after the battery as displaying, in the State's terms, "the plainly obvious fact that he was well over 60 based on his physical appearance alone." But nothing is "plainly obvious" about the specific age of the victim. To the contrary, while the State points to Manella's gray hair, the defense notes that he was not entirely gray, with some brown mixed in. Of course, gray hair is not the exclusive province of those who have reached age 60. The majority's description of Manella's photograph could easily apply to a person aged in their fifties or even their forties. The State additionally described Manella as "wearing pajamas," but the defense points out that he was dressed in denim pants, a black T-shirt, and leather shoes, and he did not appear prepared to go to sleep but was outside smoking a cigarette with his wallet in his back pocket. Setting aside for a moment the fact that being a Jennings Terrace resident does not mean that he was 60 years of age or older, Manella's appearance in the photo itself fails to establish his age as 60 or older, much less defendant's knowledge thereof.

¶ 134 Reliance on outward appearances to determine age can be extremely unreliable. For example, in the two photographs immediately below, which one is actually of a man "60 years of age or older"?



¶ 135   On the right, Wilford Brimley was only 49 years old when the photograph was taken in 1985 during filming of the movie, *Cocoon*, in which he portrayed a character in his seventies (who resided in an "old-folks home"). On the left, Tom Cruise was 61 years old when the photograph was taken in 2023 while filming *Mission: Impossible—Dead Reckoning Part One*. Even allowing for the makeup magic of Hollywood, such visual comparisons make clear that outward appearance is not a reliable standard upon which to base a felony conviction of a crime that explicitly requires proof that a defendant knows the specific minimum age of his victim. This is especially true when the victim was not previously known to the defendant. In this case, it is worth highlighting Manella's wildly inaccurate estimate of defendant's age, describing him as being between 12 and 24 years younger than his actual age at the time.

¶ 136   Estimating a stranger's age is a fraught exercise even in the best of circumstances. But these were not the best of circumstances. This was a very brief encounter in dim lighting involving strangers of different generations and races, which resulted in the victim himself being unable to identify (or even accurately describe) his attacker. Yet the majority declares that the jury could

reasonably infer from these circumstances that defendant had enough light, time, and observational acumen to discern—indeed to *actually know beyond a reasonable doubt*—that Manella was 60 years of age or older. The statute does not say a defendant "should have known" his victim was aged 60 or older, nor does it say the victim may "appear" to be that age. Nonetheless, in affirming the judgment, the majority opinion effectively reads into the statute's scienter element on age the clause "or should have known." Under its plain language, the statute requires more than evidence that the defendant described the victim as "old" or knew the victim was a resident of an "old-folks home." It requires evidence that the defendant actually knew his victim was aged 60 or older, which requires much more than what was presented in this case. Under these circumstances, no rational trier of fact could have found this essential element of the crime beyond a reasonable doubt. See *Lorenzo Smith*, 2015 IL App (4th) 131020, ¶ 47.

¶ 137   As to the fourth piece of evidence, the majority describes the building in question as a "nursing home," as if that had any significance beyond Manella's use of the term "old-folks home." The term "nursing home" was also used repeatedly by the State at trial and on appeal. The term was never defined, leaving the jury to falsely infer that a facility alternately described as a "nursing home," "sheltered care," "supported living," or "assisted lifestyle" must house only residents who are age 60 or older. However, not only were these terms undefined, but their use in this case was quite misleading. While Jennings Terrace included a "nursing facility," that is not where the battery occurred, nor was it where Manella resided. In fact, Manella testified that the entrance where the attack took place was the entrance to the "sheltered care" portion of the facility, the side of the building in which he resided. No definition of "sheltered care" was ever provided to the jury, even after they inquired of the circuit court during their deliberations, "What is sheltered care living?"

¶ 138   If the jury had been instructed or received any evidence as to the definitions of these types of facilities, it could have drawn no other inference than that the terms were meaningless to prove Manella's age, much less defendant's knowledge thereof. For example, section 10 of the Assisted Living and Shared Housing Act (Act) (210 ILCS 9/10 (West 2020)) defines an " '[a]ssisted living establishment' " as "a home, building, residence, or any other place where sleeping accommodations are provided for at least 3 unrelated adults, at least 80% of whom are 55 years of age or older." See also 77 Ill. Adm. Code 295.200 (2023). Thus, an individual living in an assisted living facility can be under the age of 60 (as Manella had been when he first lived at Jennings Terrace). Indeed, section 75 of the Act, which describes residency requirements, does not list a required minimum age for residency. See 210 ILCS 9/75 (West 2020). Similarly, the definition of "facility" under the Nursing Home Care Act (210 ILCS 45/1-113 (West 2020)) does not include an age threshold, and a "resident" is merely defined as "a person receiving personal or medical care, including but not limited to mental health treatment, psychiatric rehabilitation, physical rehabilitation, and assistance with activities of daily living, from a facility" (*id.* § 1-122). The Illinois Administrative Code defines "sheltered care" as "a location licensed as a sheltered care facility under the Nursing Home Care Act." 77 Ill. Adm. Code 295.200 (2023). The Administrative Code does not list a minimum age for recipients of such care. The Nursing Home Care Act merely describes the term "sheltered care" as "maintenance and personal care," without listing any minimum age limitation. 210 ILCS 45/1-124 (West 2020). Finally, "assisted lifestyle," the term on the sign outside the location of the battery in question, is not defined by statute or regulation, but appears to be a marketing term.

¶ 139   In short, any description of the facility's name or category of care at trial was not only insufficient evidence from which a jury could infer that its residents were necessarily aged 60 or

older (much less that defendant knew that), but it was actively misleading when used without the actual definitions of these facilities. Moreover, Manella himself testified that he had been residing there for 10 years (presumably because of his physical disability). The jury may have missed the significance of this bit of testimony: Manella was 68 when he testified, meaning that Manella himself had been admitted as a resident prior to age 60. This further undermines any reliance on the label of the facility as implying a minimum age of 60. The facility in which Manella lived clearly accepted residents on the basis of their care needs or disabilities, not their age.

¶ 140    Finally, the majority here emphasizes the "purpose" of the statute, accepting the State's argument that the *Lorenzo Smith* court "re-weighed the evidence" and even "subverted the purpose of the legislature in enacting the statute." Of course, this argument completely ignores the purpose of the legislature's *amendment* to the statute, which added the scienter requirement concerning age. The purpose of the prior strict liability version of the statute was clearly "to protect senior citizens who were defenseless and often the prey of muggers, and [to provide] that the person who sought to attack another *did so at the risk that his victim would be 60 years old*." (Emphasis added.) *People v. Jordan*, 102 Ill. App. 3d 1136, 1139 (1981). The *Jordan* court reviewed the legislative history of the pre-2006 version of the statute, comparing the lack of a scienter requirement as to the victim being age 60 or older to other statutes concerning child victims, in which the prosecution did not need to prove an offender knew a victim's age. The court noted that the legislature had reasoned that proving knowledge of a victim's age being 60 or older "would be so difficult that the purpose of the act would be nullified, and they recognized that a person's age is not so readily ascertainable as is the status of a person who is a police officer or a fireman." *Id.*

¶ 141    Yet, 24 years later, the legislature changed the statute to add the very requirement it had previously believed was too difficult to prove. Pub. Act 94-327, § 5 (eff. Jan. 1, 2006). This court

held as much in *Jasoni*: "we presume that the legislature intended to change the law of aggravated battery" and the plain language of the amended aggravated battery statute "requires a defendant to know that the victim is 60 years of age or older at the time of the battery in order to sustain a charge of aggravated battery under this section." 2012 IL App (2d) 110217, ¶ 18. The amendment is clear and unambiguous in requiring such knowledge, obviating any resort by this court to legislative history, intent, or a perceived original "purpose."

¶ 142    Rules of statutory construction require that we interpret the language of the statute as written unless there is some ambiguity in the statute. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 81 (1994). "The goal of statutory interpretation is to ascertain and give effect to the legislature's intent." *Doyle v. Executive Ethics Comm'n*, 2021 IL App (2d) 200157, ¶ 23. "The best indicator of the legislature's intent is the language of the statute, which should be given its plain and ordinary meaning." *Id.* This court cannot depart from the language of the statute by reading into it exceptions, limitations, or conditions that conflict with the express intent of the legislature. *People v. McClure*, 218 Ill. 2d 375, 382 (2006) (citing *People v. Martinez*, 184 Ill. 2d 547, 550 (1998)). When courts find statutory language to be plain and unambiguous, "we may not resort to the legislative history or other aids of statutory construction." *Policemen's Benevolent Labor Committee v. City of Sparta*, 2020 IL 125508, ¶ 22.

¶ 143    Since the 2006 amendment took effect, appellate courts have published only two opinions interpreting this statute. In *Jasoni*, 2012 IL App (2d) 110217, ¶¶ 18, 22, this court not only held that the statute "requires a defendant to know that the victim is 60 years of age or older at the time of the battery," but also held that sufficient circumstantial evidence was presented in the case. We reviewed testimony that the defendant was the victim's son-in-law and had known the victim for 20 years at the time of the battery, the defendant's son was the victim's grandson, and the victim

frequently visited the defendant's home. *Id.* ¶ 22. Because of the "close familial relationship" over "such a long period of time," this court held that "the trier of fact could have quite reasonably rejected the notion that the defendant did not know of [the victim]'s age." *Id.* Furthermore, evidence at trial showed the defendant paid the victim rent, shared an apartment with the victim's son, and "interacted with [the victim] regularly." *Id.* ¶¶ 22-24. We added, "most people have a general idea of the ages of their family members" and found that sufficient evidence had been presented to find that the defendant actually knew that his ex-mother-in-law, the grandmother to his son, was 60 years of age or older at the time of the battery. *Id.* ¶ 25.

¶ 144 In this case, nowhere near the amount or quality of the evidence in *Jasoni* was presented to the jury on the question of defendant's knowledge of Manella's age at the time of the offense. The facts here stand in stark contrast to those in *Jasoni*: a momentary encounter between strangers in poor lighting where Manella inaccurately described defendant (including underestimating his age range by more than one to two decades) and defendant described Manella using merely the general and relative descriptor "old."

¶ 145 The other published case on the amended aggravated battery statute is also instructive. Three years after our decision in *Jasoni*, the Fourth District, in *Lorenzo Smith*, 2015 IL App (4th) 131020, held that evidence of a "long-term friendship and status as roommates at the time the offense was committed" was not sufficient to prove defendant knew that the victim was aged 60 or older. *Id.* ¶ 45. The victim had suffered a stroke and had physical disabilities and memory limitations. *Id.* ¶ 11, 16. The defendant was described as the victim's "caregiver" and roommate at two locations for a period of over a month, the defendant "filled out joint rental applications" with the victim, and the victim entrusted the defendant with "his debit card PIN." *Id.* ¶ 45. Despite this "trusting relationship," there was no evidence that the "defendant was aware of [the victim]'s

age." *Id.* ¶ 45-46. There was no testimony that the victim "told defendant his age or birth date, and during the brief period in which [the victim] and defendant were roommates, [the victim] did not celebrate a birthday." *Id.* ¶ 46. Despite the relationship, the court noted that there was no evidence the defendant ever saw the victim's rental application, medical records, or any other document showing the victim's age or birth date. *Id.* The court reversed the jury's verdict on aggravated battery and reduced the conviction to the lesser included offense of battery. *Id.* ¶ 48.

¶ 146    The evidence in this case is far weaker than the evidence in either *Jasoni* or *Lorenzo Smith*. Although it is not this court's duty to reweigh the evidence, the jury here notably never heard any evidence, circumstantial or direct, that defendant had actual knowledge of Manella's age. Defendant and Manella had never met each other before and had no prior relationship, unlike the defendants and victims in *Lorenzo Smith* (caregiver relationship of more than one month) and *Jasoni* (familial relationship of more than 20 years). Moreover, the "old" victim in this momentary encounter in poor lighting was not even able to identify his "too old" assailant, highlighting the absurdity of inferring that this was enough information to decide beyond a reasonable doubt that defendant had actual knowledge that Manella was aged 60 or older.

¶ 147    The State needed to prove more than the fact that Manella was aged 60 or older at the time of the assault. Under the amended version of section 12-3.05(d)(1), the State was required to prove beyond a reasonable doubt that defendant actually *knew* Manella was aged 60 or older at that time. See *id.* ¶ 47. As in *Lorenzo Smith*, the State here simply "pyramided intervening inferences in an attempt to create evidence not otherwise contained in the record." *Id.* ¶ 46. Indeed, during closing argument, the *prosecutor* stated to the jury, "His name is Kevin Cooper. It's not Nostradamus, okay? He's not a psychic. He cannot just guess the details of what actually happened." Although he was addressing defendant's descriptions of the incident to Detective Moore, this commonsense

statement also underscores the fact that defendant could not simply guess Manella's age by momentary appearances alone.

¶ 148   Defendant conceded in his opening brief that he committed the lesser included offense of battery, and a review of the record demonstrates that the evidence was clearly sufficient to support a conviction of battery. Accordingly, pursuant to this court's powers under Illinois Supreme Court Rule 615(b)(3) (eff. Jan. 1, 1967), I would vacate defendant's conviction of and sentence for aggravated battery, enter a conviction of the misdemeanor offense of battery (720 ILCS 5/12-3(a) (West 2020)), and remand for sentencing on the battery conviction (*id.* § 12-3(b)). *Lorenzo Smith*, 2015 IL App (4th) 131020, ¶ 48; see *People v. Williams*, 267 Ill. App. 3d 870, 879-80 (1994) (finding that the evidence was insufficient to prove the only charged offense, but the defendant could be convicted of an offense not expressly charged by the charging instrument if the offense was a lesser included offense, and, because the evidence proved the lesser charge, the court was authorized under Rule 615(b)(3) to reduce the degree of the offense).

¶ 149   While the legislature has a legitimate, even compelling, interest in ensuring the safety of the elderly citizens of this State, the General Assembly in 2006 clearly added to the requirements for a felony conviction of aggravated battery to a person 60 years of age or older. In the ensuing 17 years, the legislature has amended section 12-3.05 approximately two dozen times. It has not changed the scienter requirement of victims being aged 60 and older, despite two published appellate court opinions confirming the increased difficulty in sustaining such convictions. The legislature is free to change this standard for future offenses, but this court cannot, " 'under the guise of statutory interpretation, *** "correct" an apparent legislative oversight' " by interpreting a statute " 'in a manner inconsistent with its clear and unambiguous language.' " *McClure*, 218 Ill. 2d at 388 (quoting *People v. Pullen*, 192 Ill. 2d 36, 42 (2000)).

¶ 150   For the foregoing reasons, I respectfully dissent.

*People v. Cooper*, **2024 IL App (2d) 220158**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 20-CF-2152; the Hon. Donald Tegeler, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Andrew Thomas Moore, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and John G. Barrett, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |